IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * * * * * * * *

| | |
|---|---|
| CURTIS RICHMOND,          ) | |
| ) | Civil No. 2:06-CV-15BSJ |
| Plaintiff,    ) | |
| ) | **MEMORANDUM OPINION** |
| vs.                  ) | **& ORDER** |
| ) | **(Fed. R. Civ. P. 15(a))** |
| WAMPANOAG TRIBAL COURT    ) | |
| CASES: Case: 2005-301-EFS; Case    ) | |
| 2005-302-BOA; Case 2005-300-CB,    ) | |
| ) | |
| Defendants.    ) | |

```
                    FILED
          CLERK, U.S. DISTRICT COURT
            April 21, 2006 (3:44pm)
              DISTRICT OF UTAH
```

* * * * * * * * *

The above-captioned proceeding is now before the court on Curtis Richmond's motion to amend his pleadings following this court's dismissal of his original petition for a writ of mandamus. *See* Fed. R. Civ. P. 15(a).

**Procedural History**

Plaintiff Curtis Richmond commenced the above-captioned action by filing a document captioned as a "Writ of Mandamus Confirming Pembina Nation Little Shell Calif. Federal Tribal Circuit Court Ordered Writ of Mandamus so Law Enforcement Must Obey Lawful Tribal Court Orders Supported by U.S. Supreme Court Rulings," on January 5, 2006 (dkt. no. 1). But Richmond did not name any federal government officer or other person, officer, corporation, or inferior court as a respondent to his petition and against whom relief in the nature of mandamus would lie.

Because this court was not satisfied that Richmond had properly invoked the subject matter jurisdiction of this court in commencing this action without naming a respondent, it dismissed his petition for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(h)(3) ( "[w]henever it appears by suggestion of the parties or otherwise

that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").
(*See* Order of Dismissal, filed February 23, 2006 (dkt. no. 6).)

On March 6, 2006, Richmond filed an amended petition for a writ of mandamus
(dkt. no. 7).  The court struck that pleading because of Richmond's failure to obtain leave
of court to amend his pleadings.  (*See* Order, filed March 7, 2006 (dkt. no. 9).)

On March 14, 2006, Richmond filed a "Motion for Leave of Court to Amend Writ
of Mandamus to Conform with Subject Matter Jurisdiction Issues Covered in Court Order
to Dismiss Without Prejudice" (dkt. no. 11) ("Mot. To Amend"), followed by an
"Addendum or Supplement to Plaintiff's Motion for Leave to Amend,"& etc., filed
March 30, 2006 (dkt. no. 12) ("Addendum").  Richmond has submitted additional papers
as well.

Richmond's proposed amended writ petition names several federal officers as
respondents: the Attorney General of the United States, the Director of the Federal
Bureau of Investigation, the United States Attorney for the Southern District of
California, United States Marshal David McAllister, and "F.B.I. Agent Mario Ruiz."
It appears to seek relief in the nature of a writ of mandamus compelling the respondents
to "Obey their Oath of Office to Support and Defend the U.S. Constitution," including
"Obeying Judge Henry Lee Norman Anderson's Writ of Mandamus."  (Mot. to Amend at
3.)  In Richmond's view, "This Court has a Duty and Obligation to Confirm Judge
Anderson's Lawful and Enforceable Writ of Mandamus."  (*Id.* at 3-4.)

The referenced "Writ of Mandamus" appears to be captioned in the "Pembina
Nation Little Shell California Federal Tribal Circuit Court" and purports to address "three
major legal issues," including "Sovereignty of Indian Tribes" and whether "Non Indians
must obey Indian Court Orders," whether "All Lawful Judges must have Judicial Oaths

on File," and "Malfeasance of a Judicial Oath occurs if a Judge does not Obey his Judicial Oath." ("Writ of Mandamus," dated December 20, 2005, a copy of which in annexed to Mot. to Amend.) It appears to confirm that "judgments of 'courts of common justice' are valid, real, and enforceable," apparently referring to orders of the "Supreme Court Wampanoag Tribe of Grayhead Wolf Band" directed to two state superior court and federal district judges in California concerning pending litigation involving Richmond. Those orders purport to dismiss the cases pending against Richmond in the California state and federal courts (and Third District Court in the State of Utah) for lack of jurisdiction, ostensibly on the theory that "[t]he Supreme Court of Wampanoag Tribe of Greyhead Wolf Band has Jurisdiction over all Tribal Members"—including Richmond as an "adopted" member—and that those courts have shown "Bias towards the Plaintiff" and have violated "the Plaintiff's Constitutional Right of Due Process."[1]

### Richmond's Theory of the Case

To date, Richmond has submitted at least a dozen papers in this case, proffering numerous quotations extracted from judicial opinions—often Nineteenth-Century Supreme Court cases published in the earlier volumes of the *United States Reports*—as well as law dictionaries, encyclopedias, and federal and state code provisions. The quotations speak to various aspects of Indian tribal status, the jurisdiction of state and federal courts, and the rule of law. Richmond weaves the selected quotations into a rambling and circuitous dissertation, rich in sweeping abstractions phrased in oft-capitalized and abstruse legalistic prose.

As best the court can glean from the papers now in the file, Richmond contends

---

[1]("Order, Case No. 2005-301-EFS," dated April 8, 2005, a copy of which is annexed to "Writ of Mandamus Confirming Pembina Nation Little Shell Calif. Federal Tribal Circuit Court Ordered Writ of Mandamus so Law Enforcement Must Obey Lawful Tribal Court Orders Supported by U.S. Supreme Court Rulings," filed January 5, 2006 (dkt. no. 1).)

that federal law principles of Indian tribal sovereignty[2] empower the "Supreme Court of Wampanoag Tribe of Greyhead Wolf Band" to enter orders preempting the exercise of civil jurisdiction by state and federal courts over his person and property in cases already commenced in those courts by Citibank, Bank of America, and others, and that it may do so in favor of compulsory adjudication of those parties' claims in the tribal forum.  The "Supreme Court of Wampanoag Tribe of Greyhead Wolf Band" having issued such orders, and the "Pembina Nation Little Shell California Federal Tribal Circuit Court" having issued a December 20, 2005 writ confirming that the former court's orders are "valid, real, and enforceable," Richmond further contends that the named federal officers are duty-bound to "enforce" those orders, including "bench warrants" and awards of sanctions of $1,000 per day as against each of the defendants named in the tribal proceedings because "[t]he defendants must know that Tribal members have absolute sovereign authority"—and, it seems, absolute immunity from the civil jurisdiction of state and federal courts.  Failing this, the respondents would "stand convicted of treason for failure to honor and enforce the spirit and letter of law."[3]

Richmond further asserts that this court may—indeed, *must*—grant relief in the nature of a writ of mandamus requiring the Attorney General of the United States, the Director of the Federal Bureau of Investigation, the United States Attorney for the Southern District of California, and various federal law enforcement officers to do the bidding of the "Supreme Court of Wampanoag Tribe of Greyhead Wolf Band" and carry that tribunal's orders into full force and effect, as well as vacating any orders or

---

[2]As the Supreme Court has often noted, "Indian tribes occupy a unique status under our law," and "retain some of the inherent powers of the self-governing political communities that were formed long before Europeans first settled in North America."  *National Farmers Union Ins. Cos. v. Crow Tribe,* 471 U.S. 845, 851 (1985) (footnotes omitted).

[3]("Writ of Mandamus," dated December 20, 2005, a copy of which in annexed to Mot. to Amend, at 3.)

judgments entered by the state and federal courts in the subject proceedings since the tribal orders were issued.

**The Enforcement of Orders of Indian Tribal Courts**

Richmond's proposed pleading seeks an order of this court decreeing the enforcement of orders issued by the "Supreme Court of Wampanoag Tribe of Greyhead Wolf Band," and in doing so, he raises the threshold question whether that tribunal possessed the requisite subject matter and personal jurisdiction to make those orders:

> We are unwilling to enforce judgments of tribal courts acting beyond their authority, especially where defendants have a federal right "to be protected against an unlawful exercise of Tribal Court judicial power," *Nat'l Farmers,* 471 U.S. at 851, 105 S.Ct. 2447; *see Wilson,* 127 F.3d at 810 (holding that "federal courts must neither recognize nor enforce tribal judgments if: (1) the tribal court did not have both personal and subject matter jurisdiction; or (2) the defendant was not afforded due process of law").

*MacArthur v. San Juan County*, 309 F.3d 1216, 1225 (10th Cir. 2002) (quoting *Wilson v. Marchington*, 127 F.3d 805, 810 (9th Cir.1997)), *cert. denied*, 539 U.S. 902 (2003).  In *MacArthur*, the court of appeals explained, "The threshold question in our review of the Navajo court judgment is whether the Navajo Nation's decision to exercise adjudicative power over [the non-member defendants] passes muster under *Montana*," the leading Supreme Court precedent governing the exercise of tribal civil jurisdiction over non-members.  *Id.* at 1226 (citing *Montana v. United States*, 450 U.S. 544 (1981)).

That jurisdictional question in turn is footed upon an even more fundamental premise: the *actual existence* of the Indian tribe whose authority the tribal courts purport to exercise, and federal recognition of tribal existence.

**Indian Tribal Sovereignty & Federal Recognition of Indian Tribes**

Normally, in cases involving tribal court jurisdiction, there is no genuine doubt as to the *existence* and legal status of the Indian tribe whose powers of self-government are

being exercised through the instrumentality of its courts.

> Historically, the federal government has determined that certain groups of Indians will be recognized as tribes for various purposes.  Such determinations are incident to the Indian Commerce Clause of the Constitution, which expressly grants Congress power "[t]o regulate Commerce . . . with the Indian tribes."

> When Congress or the Executive has found that a tribe exists, courts will not normally disturb such a determination. . . .

*Felix S. Cohen's Handbook of Federal Indian Law* 3 (Rennard Strickland, et al., eds. 1982) ("*Handbook* (1982 ed.)") (footnote omitted).  "For most current purposes, judicial deference to findings of tribal existence is still mandated by the extensive nature of congressional power in the field.  Congress has implicitly recognized the existence of most tribes through treaties, statutes, and ratified agreements."  *Id.* at 3-4 (footnote omitted).  In addition, "[t]he Executive also makes such determinations pursuant to statutory schemes" created by Congress, and the Secretary of the Interior, "when discharging congressionally delegated duties as the official principally responsible for administering Indian affairs, often decides that certain groups are Indians or tribes for the purpose of various statutory programs."  *Id.* at 4 (footnote omitted).

As the court of appeals recently explained:

> The law governing Federal recognition of an Indian tribe is, today, clear.  The Federally Recognized Indian Tribe List Act of 1994 provides Indian tribes may be recognized by: (1) an "Act of Congress;" (2) "the administrative procedures set forth in part 83 of the Code of Federal Regulations[;]" or (3) "a decision of a United States court." Pub. L. No. 103-454, § 103(3), 108 Stat. 4791; *see also United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 547-48 (10th Cir. 2001).  A recognized tribe is placed on the DOI's "list of recognized tribes[.]" 25 U.S.C. §§ 479a(3), 479a-1; 25 C.F.R. § 83.5(a).

*Cherokee Nation of Oklahoma v. Norton*, 389 F.3d 1074, 1076 (10th Cir. 2004), *as*

*amended* (10th Cir. Feb. 16, 2005),[4] *cert. denied*, 126 S. Ct. 333 (2005).

Judicial deference to the Legislative and Executive branches concerning the recognition of Indian tribes is a policy of long standing:

> In reference to all matters of this kind, it is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty it is to determine such affairs.  If by them those Indians are recognized as a tribe, this court must do the same.

*United States v. Holliday*, 70 U.S. (3 Wall.) 407, 419 (1866).  Pursuant to its plenary power rooted in the Indian Commerce Clause, among other sources, "Congress has the power, both directly and by delegation to the President, to establish the criteria for recognizing a tribe."  *Miami Nation v. United States Dep't of Interior*, 255 F.3d 342, 345 (7th Cir.2001).[5]

"In light of the deference given to congressional and executive determinations in this area," one noted commentary observes, it would appear that "the only practical limitations on congressional and executive decisions as to tribal existence are the broad requirements that: (a) the group have some ancestors who lived in what is now the United States before discovery by Europeans, and (b) the group be a 'people distinct from others.'"  *Cohen's Handbook of Federal Indian Law* § 3.02[4], at 143 (2005 ed. Nell Jessup Newton, et al., eds.) ("*Handbook* (2005 ed.)") (footnote omitted).  Yet the authority of the political branches of the federal government over questions of Indian tribal status and recognition is not without rational limits:

---

[4] *Available at* http://www.kscourts.org/ca10/cases/2004/11/03-5055a.htm.

[5]

Congress has approved a variety of mechanisms by which Indian nations can secure federal recognition, including determinations by legislative, executive and judicial bodies.  Throughout the history of tribal-federal relations, all three mechanisms have been employed.  In addition, court decisions have operated to interpret and affirm the actions of the political branches.

*Cohen's Handbook of Federal Indian Law* § 3.02[4], at 143 (2005 ed. Nell Jessup Newton, et al., eds.) (footnote omitted).

> Of course, it is not meant by this that Congress may bring a community or body of people within the range of this power by arbitrarily calling them an Indian tribe, but only that in respect of *distinctly Indian communities* the questions whether, to what extent, and for what time they shall be recognized and dealt with as dependent tribes requiring the guardianship and protection of the United States are to be determined by Congress, and not by the courts. *United States v. Holliday*, 3 Wall. 407, 419, . . . .

*United States v. Sandoval*, 231 U.S. 28, 46 (1912) (emphasis added; some citations omitted).

Federal recognition of Indian tribal existence is a matter of great importance to the "distinctly Indian communities" involved:

> The significance of the question is immediately apparent from the text of the Indian Commerce Clause of the United States Constitution, which gives Congress power "[t]o regulate Commerce . . . with the Indian *Tribes*." U.S. Const., Art. I, § 8, cl. 3. (emphasis added).  Much of the theory that underpins Indian law is that the Indian tribes possessed certain sovereign rights based on their existence as distinct political entities exercising authority over their members prior to the incorporation of their territory into the United States, *United States v. Wheeler*, 435 U.S. 313, 322, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); thus, "tribes retain whatever inherent sovereignty they had as the original inhabitants of this continent to the extent that sovereignty has not been removed by Congress." *Montana v. Gilham*, 133 F.3d 1133, 1137 (9th Cir. 1998).

> Despite this general recognition of inherent sovereignty (and, perhaps, the irony), as far as the federal government is concerned, an American Indian tribe does not exist as a legal entity unless the federal government decides that it exists.  Federal recognition affords important rights and protections to Indian tribes, including limited sovereign immunity, powers of self-government, the right to control the lands held in trust for them by the federal government, and the right to apply for a number of federal services.  "Federal recognition may arise from treaty, statute, executive or administrative order, or from a course of dealing with the tribe as a political entity." William C. Canby, Jr., *American Indian Law in a Nutshell* 4 (4th ed. 2004).

*Kahawaiolaa v. Norton*, 386 F.3d 1271, 1272-73 (9th Cir. 2004) (footnote omitted).  The Interior Department regulations governing federal recognition and acknowledgment of tribal status reflect a similar view of its significance:

> Acknowledgment of tribal existence by the Department is a prerequisite to

> the protection, services, and benefits of the Federal government available to Indian tribes by virtue of their status as tribes. Acknowledgment shall also mean that the tribe is entitled to the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship with the United States as well as the responsibilities, powers, limitations and obligations of such tribes. Acknowledgment shall subject the Indian tribe to the same authority of Congress and the United States to which other federally acknowledged tribes are subjected.

25 C.F.R. § 83.2 (2006). Federal recognition thus has important implications for the legal status of Indian tribes and the respective jurisdiction of federal, state and tribal governments over tribal members and non-members within the tribe's domain. *See Handbook* (2005 ed.) § 3.02[3], at 138-40 & nn.19-30.

### Federal Recognition & the Interior Department List of Indian Entities

Today "[t]here are 561 federal recognized tribal governments in the United States," according to the Bureau of Indian Affairs,[6] with several additional groups currently petitioning for federal acknowledgment through the procedure established by congressional legislation and federal regulations.[7] Pursuant to the duties assigned and authority delegated to it by Congress,[8] the Interior Department maintains a complete list of all 561 "Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs," updated every year or two and published in the *Federal Register*. *See* 70 Fed. Reg. 71193 (November 25, 2005).

*James v. United States Dep't of Health & Human Services*, 824 F.2d 1132 (D.C. Cir. 1987), involved an intra-tribal rivalry between two factions of the Gay Head Indians of Martha's Vineyard, Massachusetts, which had not been recognized as a tribe when the

---

[6] http://www.doi.gov/bureau-indian-affairs.html.

[7] *See* 25 C.F.R. Part 83 (2005).

[8] *See* Federally Recognized Indian Tribe List Act of 1994, Act of November 2, 1994, Pub. L. 103-454, § 104,108 Stat. 4791, *codified at* 25 U.S.C.A. § 479a-1 (2001); 25 U.S.C.A. §§ 2, 9 (2001).

acknowledgment regulations were first promulgated.  One faction, the Widdis group,

followed the acknowledgment procedures, filed a petition with the Department of

Interior, and was recognized in 1987.  The other faction, the James group, contended that

the Gay Head Indians had been recognized at least since the Nineteenth Century and

therefore sought a court order placing the tribe on the Department of Interior's list of

recognized tribes.  The D.C. Circuit declined to decide whether the evidence of historical

recognition presented by the James group supported their claim, reasoning that Congress

has specifically authorized the Executive Branch to decide issues of tribal recognition,

and that the Interior Department has developed procedures for the determination of tribal

status.  "That purpose would be frustrated if the Judicial Branch made initial

determinations of whether groups have been recognized previously or whether conditions

for recognition currently exist."  *Id.* at 1137.

 In this Circuit, the Interior Department list may be decisive of the existence of a

federal-tribal "government-to-government" relationship:

> The judiciary has historically deferred to executive and legislative
> determinations of tribal recognition. *See United States v. Rickert*, 188 U.S.
> 432, 445, 23 S.Ct. 478, 483, 47 L.Ed. 532 (1903); *United States v. Holliday*,
> 70 U.S. (3 Wall.) 407, 419, 18 L.Ed. 182 (1865).  Although this deference
> was originally grounded in the executive's exclusive power to govern
> relations with foreign governments, broad congressional power over Indian
> affairs justifies its continuation.  *We therefore conclude that the Tribe's*
> *absence from this list is dispositive.* . . .

*Western Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1057 (10th Cir. 1993) (emphasis

added & citation omitted) (citing *Edwards, McCoy & Kennedy*, 18 I.B.I.A. at 457 (stating

that 25 C.F.R. pt. 83 procedures "are binding on the Department of the Interior as to

which Indian entities may be considered Indian tribes under statutes and regulations

which do not define the term 'Indian tribe.'")).  Rejecting the assertion that the plaintiff

group had been "federally recognized" under the standards outlined in *Montoya v. United*

*States*, 180 U.S. 261 (1901),[9] the court of appeals "conclude[d] that the limited circumstances under which ad hoc judicial determinations of recognition were appropriate have been eclipsed by federal regulation." *Id.* at 1056. *But cf. United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 547 (10th Cir. 2001) (noting that 25 U.S.C. § 479a provides Indian tribes may be recognized by Acts of Congress, by administrative procedures set forth in the regulations, "or by a decision of a United States court").

While the court of appeals has since expressed the view that *Western Shoshone* "does not apply to preexisting Indian rights recognized and guaranteed by a treaty, statute, or executive order" such as hunting, fishing and gathering rights on an existing Indian reservation, *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1204 (10th Cir. 2002), we are not concerned in this case with Indian tribal property interests or rights to use natural resources. *Cf. Menominee Tribe of Indians v. United States*, 391 U.S. 404 (1968) (holding that Indian tribe's treaty hunting rights survived congressional termination

---

[9]*Montoya*, a case repeatedly cited by Richmond, decided whether a group comprised of nearly 200 Indians from the Chiricahua, Mescalero, and Southern Apache tribes as well as "a number of unknown Indians from Mexico," who were "allied together under the name of Victoria's band for the purpose of aiding Victoria and his followers in their hostile and warlike acts against the citizens and the military authorities of the United States," would be considered part of the Mescalero Apache Tribe for purposes of determining both "the liability of the United States for the acts of Indian marauders" and that of "the tribe of Indians committing the wrong, when such can be identified," under the Indian Depredations Act of 1891, Act of March 3, 1891, ch. 538, 26 Stat. 851.

> By a 'tribe' we understand a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory; by a 'band,' a company of Indians not necessarily, though often, of the same race or tribe, but united under the same leadership in a common design. While a 'band' does not imply the separate racial origin characteristic of a tribe, of which it is usually an offshoot, it does imply a leadership and a concert of action. How large the company must be to constitute a 'band' within the meaning of the act it is unnecessary to decide. It may be doubtful whether it requires more than independence of action, continuity of existence, a common leadership, and concert of action.

180 U.S. at 266. The *Montoya* Court concluded that "Victoria's Band" was legally distinguishable from the Mescalero Apache Tribe, which was "in amity with the United States," and that the tribe should not be held liable for the band's actions: "if the marauders are so numerous and well organized as to be able to defy the efforts of the tribe to detain them, in other words, to make them a separate and independent band, carrying on hostilities against the United States, it would be obviously unjust to hold the tribe responsible for their acts." *Id.* at 268.

federal recognition of Indian tribe); *Kimball v. Callahan*, 493 F.2d 564 (9th Cir.), *cert. denied*, 419 U.S. 1019 (1974) (same); *Kimball v. Callahan*, 590 F.2d 768 (9th Cir.), *cert. denied*, 444 U.S. 826 (1979) (same); *United States v. Felter*, 546 F. Supp. 1002 (D. Utah 1982), *affirmed* 752 F.2d 1505 (10th Cir. 1985) (recognizing terminated Indians' hunting rights on Indian reservation lands).

We are concerned here with Richmond's plea that this court order the summary enforcement by federal officers of what purport to be Indian tribal court orders demanding the dismissal of civil actions in the state and federal courts involving Mr. Richmond.

### Federal Recognition & Richmond's Claims in This Case

In this case, Richmond submits that the "Wampanoag Tribe of Greyhead Wolf Band" and "Pembina Nation Little Shell Band" are federally recognized Indian tribes. But at least as of its November 25, 2005 publication, neither group appears by name on the Interior Department's list of federally recognized Indian tribes.  *See* 70 Fed. Reg. at 71193-71198.

Richmond's papers point to other indicia of federal recognition, including the Treaty with the Chippewa, Red Lake and Pembina Bands, dated October 2, 1863, 13 Stat. 667, the Presidential Message transmitting that treaty to the Senate for ratification, compiled excerpts from historical congressional and executive documents,[10] the Montana Supreme Court's opinion in *Koke v. Little Shell Tribe of Chippewa Indians of Montana, Inc.*, 2003 MT 121, 315 Mont. 510, 68 P.3d 814, a page printed from a "Pembina Nation

---

[10]The partial compilation attached to Richmond's "Supplement to Plaintiff's Motion for Leave to Amend Writ of Mandamus to Conform with Subject Matter Jurisdiction," filed April 7, 2006 (dkt. no. 13), appears to have been copied from a Native American Web site.  *See* "Old Crossing treaty with the Red Lake and Pembina Bands of Chippewa," *at* http://www.maquah.net/Historical/1863/1863-1864_treaty-INDEX.html.

Little Shell Band" Web site,[11] and assorted correspondence.

The *Koke* case involved a group known as the Little Shell Tribe of Chippewa Indians of Montana, Inc., incorporated under the laws of the State of Montana and actively seeking federal recognition through the acknowledgment procedure established by Congress and the Department of the Interior.  *See* U.S. Dept. of the Interior, Bureau of Indian Affairs, *Proposed Finding for Federal Acknowledgment of the Little Shell Tribe of Chippewa Indians of Montana*, 65 Fed. Reg. 45394 (July 21, 2000).  *Koke* makes no reference to the "Pembina Nation Little Shell Band," a group which appears to be centered in North Dakota[12] and claims a territory of 62,000,000 acres—including about three-fourths of the State of North Dakota.

In *Delorme v. United States*, 354 F.3d 810 (8th Cir. 2004), the Eighth Circuit outlined the distinction between the two groups:

> At least two groups currently claim to be Little Shell Bands descended from the Pembina led by Chief Little Shell in the late nineteenth century.  The Little Shell Band of Chippewa Indians of North Dakota (also known as the Little Shell Pembina Band of North America) is a federally unrecognized band located in North Dakota.  It is seeking federal recognition through the BIA, and it is on behalf of this band that Ronald Delorme has filed his action.  It is not clear, however, how this group relates to the Little Shell Bands involved in the 1978 Indian Claims Commission litigation.  The Little Shell Tribe of Chippewa Indians of Montana, located in Great Falls, Montana, descends from a part of the Pembina Band led by Chief Little Shell which moved to that area at the end of the nineteenth century.  The Montana Tribe appears to be the successor in interest to the Little Shell Band of Chippewa Indians represented by Joseph H. Dussome in the 1970s Indian Claims Commission litigation, and

---

[11] *See* http://www.pembinanation1863.com/.  This group appears to be governed by a "Grand Council" comprised of members of the family of Ronald Delorme, "hereditary chief of the Little Shell Band of Indians of North Dakota." 354 F.3d at 811.

[12] According to Richmond's exhibit, "The Grand Council of 1863, the governing group for the Pembina Nation Little Shell Band, live primarily in so-called north central North Dakota." ("Welcome to the Pembina Nation Little Shell Band of North America," *at* http://www.pembinanation1863.com/default.asp, a copy of which is annexed to "Plaintiff's Supplement to Plaintiff's Motion for Leave to Amend Writ of Mandamus to Conform with Subject Matter Jurisdiction," filed April 7, 2006 (dkt. no. 13) ("Pet. Supp.").)

> its members appear to have participated as individuals in the earlier
> litigation as well.  Presently the Band is seeking federal recognition through
> the BIA, and it is not involved in the case before the court.

354 F.3d at 814 n.6.

Citing to *Koke* and *Montoya v. United States*, 180 U.S. 261, 266 (1901), Richmond asserts that the "Wampanoag Tribe of Greyhead Wolf Band" is "Common Law Organized," and that "the Tribe's National Sovereignty . . . is Recognized by the U.S. Supreme Court Rulings."[13]  But he neither cites to nor furnishes copies of any treaties, statutes, court decisions, administrative rulings or other pertinent materials reflecting any recognition of a group known as the "Wampanoag Tribe of Greyhead Wolf Band" by Congress, the Executive Branch or the federal or state courts.  Instead, he submits an April 8, 2002 letter addressed to "Chief Dale Stevens" of the "Wampanoag Tribe of Greyhead Wolf Band" at an address in Vernal, Utah, from someone identified as "Chief Counsel" of the "Ministry of Justice" of the "NATO Indian Nation," having an address in Provo, Utah.  The letter purports to "recognize[] the Wampanoag Nation, Tribe of Greyhead, Wolf Band" and establish "government-to-government" relations with the Wampanoag."  (Unauthenticated copy of letter annexed to Mot. to Amend.)

Richmond's written submissions furnish but a very slender reed upon which to rest his sweeping assertions as to the existence, sovereignty and jurisdiction of either the "Wampanoag Tribe of Greyhead Wolf Band" or "Pembina Nation Little Shell Band," or for that matter, his claims of "diplomatic immunity" from suit in state and federal courts in California and Utah.  A litigant may assert that, like the appellant in *Davis v. Packard*, 33 U.S. (8 Pet.) 312 (1834), he, too, stands before the court as "consul-general of the King of Saxony and [is] therefore exempt from suit in the state court," but the mere

---

[13](Addendum at 6.)

assertion, by itself, does not establish the fact.

Federal recognition "'involves more than past existence as a tribe and its historical recognition as such.  There must be a currently existing group distinct and functioning as a group in certain respects and recognition of such activity must have been shown by specific actions of'" the Bureau of Indian Affairs, the Interior Department, or the Congress.  *Handbook* (1982 ed.) at 14-15 (quoting Memo. Sol. Int., dated Dec. 13, 1938); *see United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 548 (10th Cir. 2001) (rejecting "bare assertion" that Indians were present-day embodiment of the Shawnee Tribe; prior explicit recognition of the Tribe in an 1854 Treaty and by the United States Supreme Court not determinative where there was no evidence Indians had maintained identity with Shawnee tribe or had continued to exercise tribe's sovereign authority).

Federal recognition of tribal existence involves much more than simple self-identification; it is a matter of history, ancestry and continuing community.

In related proceedings in this District, the court concluded that the "Wampanoag Tribe of Greyhead Wolf Band" was actually "formed at an Arby's Restaurant in Provo, Utah on April 18, 2003,[14] and is not in fact a federally recognized Indian tribe—a fact apparently not in genuine dispute in that proceeding.

In contrast, the *James* case, discussed above, involved "the Gay Head Wampanoags who have inhabited the area [of Martha's Vineyard, Massachusetts] since 1642.  They have been commonly known as American Indians from historical times until

---

[14](Memorandum Opinion and Order, filed April 3, 2006 (dkt. no. 130), in *James W. Burbank v. United States District Court, et al.*, Civil No. 2:04-CV-742 JEC (D. Utah), at 3.)  Judge Conway noted that "[t]his organization is not to be confused with the Wampanoag Nation, Tribe of Gayhead, Wolf Band, a federally recognized Indian Tribe on Martha's Vineyard, Massachusetts, though the similarity in name is undoubtedly no coincidence." (*Id.* at 5 n.1.)  *See Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs*, 70 Fed. Reg. 71193, 71197 (November 25, 2005) (listing "Wampanoag Tribe of Gay Head (Aquinnah) of Massachusetts").

the present." 824 F.2d at 1133.  So there *is* a federally recognized tribe of Wampanoag Indians, namely the *Wampanoag Tribe of Gay Head (Aquinnah) of Massachusetts*.  70 Fed. Reg. at 71197.

Richmond has neither averred any facts nor proffered any legal or historical material of genuine substance that would establish federal recognition of the "Wampanoag Tribe of Greyhead Wolf Band" as an Indian tribe, or that would establish that the "Pembina Nation Little Shell Band" and the Pembina Band of Chippewa Indians that was a named party to the October 2, 1863 Treaty are one and the same.

Nor does Richmond cite to any pertinent legal authority that may be read to authorize—or obligate—the named respondents or this court to enforce orders issued by the purported "tribal court" of a group not recognized as an Indian tribe by the United States.

### Richmond's Proposed Amended Pleading & Rule 15 "Futility"

But in this case, this court need not decide the merits of the question whether either the "Wampanoag Tribe of Greyhead Wolf Band" or "Pembina Nation Little Shell Band" are *bona fide* Native American tribes, bands or "distinctly Indian communities" within the meaning of the applicable federal law.  This court need not revisit the question whether the "Wampanoag Nation, Greyhead Wolf Band" was created at an Arby's in Provo in 2003; nor must it examine whether the "Pembina Nation Little Shell Band" is in fact the "active anti-government extremist group" and "part of the anti-government 'sovereign citizen' movement" that some have described it as being.[15]

---

[15] *See* Anti-Defamation League, Law Enforcement Agency Resource Network, *Extremism in America: Little Shell Pembina Band, at* http://www.adl.org/learn/ext_us/Little_Shell.asp? .

Richmond's Addendum asserts that he "is a Sovereign Civilian," that "this Court MUST recognize the Sovereign Rights of Curtis Richmond," and that "[a]s an International Sovereign Citizen, Plaintiff Curtis Richmond has Diplomatic Immunity."  (Addendum at 1, 2, 3.)  The Addendum proffers copies of several

(continued...)

-16-

Even *assuming* that Richmond's assertions concerning both entities are correct, namely that the "Supreme Court of Wampanoag Tribe of Greyhead Wolf Band" and the "Pembina Nation Little Shell California Federal Tribal Circuit Court" are legitimate Indian tribal courts, it would nevertheless prove to be futile to permit the proposed amendment of his petition because (1) the named respondents have no affirmative non-discretionary ministerial legal duty to enforce the judgments and orders of Indian tribal courts; (2) relief in the nature of mandamus cannot issue from a federal district court compelling the named respondents to enforce tribal court orders as such; and (3) this court has neither the power nor the justification on this record to enter any order purporting to vacate orders or judgments entered by the United States District Court for the Southern District of California or the state courts of California and Utah, in aid of the purported exercise of jurisdiction by the "Supreme Court of Wampanoag Tribe of Greyhead Wolf Band" or the "Pembina Nation Little Shell California Federal Tribal Circuit Court."

*None* of the extraordinary relief that Richmond seeks in this case could be granted to him under any conceivable set of facts he could prove in support of his proposed amended petition.  Under these circumstances, granting leave to file Richmond's proposed amended petition would prove to be futile at best.

> "A court properly may deny a motion for leave to amend as futile when the proposed amended complaint would be subject to dismissal for any reason, including that the amendment would not survive a motion for summary judgment."  *Bauchman for Bauchman v. West High Sch.*, 132 F.3d 542, 562

---

[15](...continued)
documents, including an "Act of State Reaffirmation of Dual Citizenship and Renunciation of Attempted Expatriation," a written notice asserting that "[a]ll people within this Dwelling, or Automobile, are SOVEREIGN PEOPLE with **DIPLOMATIC IMMUNITY** UNDER THE '**FOREIGN SOVEREIGN IMMUNITY ACT**', Title 28, USC Sec. 1602 te seq.," and a "Citizen's Treatise," discussing the deeper meanings of capitalization, abbreviation, acronyms and the subtleties of the Government Printing Office *Style Manual*.  (*Id.* (emphasis in original).)

(10th Cir. 1997); *see also Wilson v. American Trans Air, Inc.*, 874 F.2d 386, 392 (7th Cir. 1989).

*E.SPIRE Communications, Inc. v. New Mexico Public Regulation Comm'n*, 392 F.3d 1204, 1211 (10th Cir. 2004); although leave to amend is to be "freely given," Fed. R. Civ. P. 15(a), and "pro se litigants are to be given reasonable opportunity to remedy the defects in their pleadings," *Hall v. Bellmon*, 935 F.2d 1106, 1110 n.3 (10th Cir. 1991), a "district court may deny leave to amend where amendment would be futile." *Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999) . "The point can be put more strongly: a judge should not grant a motion to amend the complaint if the grant would merely set the stage for the dismissal of the amended complaint." *AM Int'l, Inc. v. Graphic Management Assocs., Inc.*, 44 F.3d 572, 578 (7th Cir. 1995).

### Federal Officers Have No Nondiscretionary Legal Duty to Enforce Indian Tribal Court Orders

Whether it be the Attorney General of the United States or a Deputy United States Marshal, officers of the United States government have no nondiscretionary, plainly defined, peremptory and affirmative legal duty to *enforce* the lawful orders or judgments of an Indian tribal court.

To start with, "[i]t is the primary role and mission of the United States Marshals Service to . . . obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals and the Court of International Trade." 28 U.S.C.A. § 566(a) (1993).   In addition, the United States Marshals "shall execute all lawful writs, process and orders issued under the authority of the United States . . . ." 28 U.S.C.A. § 566(c).  Nothing in the *United States Code* either authorizes or obligates the United States Marshals to execute or enforce orders of Indian tribal courts.

-18-

Similarly, Chapters 31, 33 and 35 of Title 18, *United States Code* vest significant authority in the Attorney General, the Federal Bureau of Investigation and the United States Attorney appointed to serve in each federal judicial district, to enforce federal laws, to investigate and prosecute violations of federal laws, and to represent the United States in legal proceedings.  *See* 28 U.S.C.A. §§ 501 *et seq.* (1993) (powers and functions of the Attorney General); 28 U.S.C.A. §§ 531 *et seq.* (investigative authority of the FBI); 28 U.S.C.A. § 547 (duties of the United States Attorney).

The *Department of Justice Policy on Indian Sovereignty And Government-to-Government Relations with Indian Tribes*, dated June 1, 1995,[16] reaffirms "the Department's recognition of the sovereign status of federally recognized Indian tribes as domestic dependent nations," and reaffirms "adherence to the principles of government-to-government relations" in its "working relationships with federally recognized Indian tribes," but nowhere does the Justice Department acknowledge any nondiscretionary duty on the part of the Attorney General or any of its officers to enforce tribal court orders at the behest of private litigants.  To the contrary, the *Policy on Indian Sovereignty* explicitly states that it is "not intended to create any right enforceable in any cause of action by any party against the United States, its agencies, officers, or any person."

Similarly, Executive Order 13084, *Consultation and Coordination With Indian Tribal Governments*, dated May 14, 1998, reaffirmed that

> [t]he United States has a unique legal relationship with Indian tribal governments as set forth in the Constitution of the United States, treaties, statutes, Executive orders, and court decisions.  Since the formation of the Union, the United States has recognized Indian tribes as domestic dependent nations under its protection.  In treaties, our Nation has

---

[16] *Available at* http://www.usdoj.gov/ag/readingroom/sovereignty.htm.

> guaranteed the right of Indian tribes to self-government. As domestic
> dependent nations, Indian tribes exercise inherent sovereign powers over
> their members and territory. The United States continues to work with
> Indian tribes on a government-to-government basis to address issues
> concerning Indian tribal self-government, trust resources, and Indian tribal
> treaty and other rights.

But it stopped far short of committing federal law enforcement officers to the routine
enforcement of the orders of Indian tribal courts.  Essentially the same is true of the
Presidential Memorandum for the Heads of Executive Departments and Agencies entitled
*Government-to-Government Relations With Native American Tribal Governments*, dated
April 29, 1994,[17] and more recently,  Executive Order No. 13175, *Consultation and
Coordination With Indian Tribal Governments*, dated November 6, 2000, 65 Fed. Reg.
67249 (Nov. 9, 2000), which superseded Executive Order No. 13084.  Among the
"fundamental principles" expressed in Executive Order No. 13175 are:

> (b) Our Nation, under the law of the United States, in accordance with
> treaties, statutes, Executive Orders, and judicial decisions, has recognized
> the right of Indian tribes to self-government. As domestic dependent
> nations, Indian tribes exercise inherent sovereign powers over their
> members and territory. The United States continues to work with Indian
> tribes on a government-to-government basis to address issues concerning
> Indian tribal self-government, tribal trust resources, and Indian tribal treaty
> and other rights.
> (c) The United States recognizes the right of Indian tribes to
> self-government and supports tribal sovereignty and self-determination.

Executive Order No. 13175, § 2(b), (c), 65 Fed. Reg. at 67249.[18]  Yet no express
requirement that federal agencies act directly to enforce tribal court orders is imposed.

The Office of Tribal Justice in the Department of Justice does not list direct
enforcement of tribal court orders and judgments among its responsibilities as the

---

[17]*Available at* http://www.usdoj.gov/archive/otj/Presidential_Statements/presdoc1.htm

[18]Executive Order No. 13175 defines "Indian tribe" as "an Indian or Alaska Native tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian tribe pursuant to the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. 479a."

Department's point of contact in "meeting the broad and complex federal responsibilities owed to federally recognized Indian tribes."[19]  Nor does any other division or office within the Justice Department.

Richmond makes frequent reference to the Oath of Office of the named respondents as well as state and federal judges as a source of a legal duty to enforce the orders at issue.  Indeed, "[t]he Amended Mandamus is Directed Specifically to the Defendant Law Enforcement Officers by name who have refused to Obey their Oath of Office . . . ."  (Mot. To Amend at 3.)  According to Richmond, the named respondents "were repeatedly asked to Obey their Oath of Office to Support and Defend the U.S. Constitution, but they have Stubbornly Refused to Obey Their Oath of Office that includes Obeying Judge Henry Lee Norman Anderson's Writ of Mandamus," (*id.*), purportedly issued by the "Pembina Nation Little Shell California Federal Tribal Circuit Court."

The oath of office taken by the Attorney General, the United States Attorneys and other federal officers undertakes to "support and defend the Constitution of the United States," but says nothing of Indian tribes, tribal law or the enforcement of tribal court orders.  *See* 5 U.S.C.A. § 3331 (1996).[20]  Neither does the oath prescribed by the Judicial Code for federal justices and judges—in substance very much the same oath as first

---

[19]"OTJ: Role and Responsibilities," *at* http://www.usdoj.gov/otj/roleandresponse.htm.

[20]The oath of office prescribed by § 3331 reads:

"I, AB, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God."

*See also* United States Senate, "Oath of Office," *at* http://www.senate.gov/artandhistory/history/common/briefing/Oath_Office.htm (describing history of oath).

required by the Judiciary Act of 1789—which speaks of "perform[ing] all the duties incumbent upon me . . . under the Constitution and laws of the United States." *See* 28 U.S.C.A. § 453 (1993).  Unless the Constitution itself, or the laws of the United States enacted under its authority, can be read to impose some affirmative legal obligation to obtain the enforcement of Indian tribal court orders *as tribal court orders*, federal officers such as the named respondents have no non-discretionary or "ministerial" duty under their oaths of office to do so.

At this point, Richmond has cited *no* provision of the United States Constitution, or any Act of Congress, ratified treaty of the United States, Executive Order, federal regulation or other law of the United States that may fairly be read to impose any such obligation on any federal officer or agency.  Nor has he pointed to any reported opinion of the United States Supreme Court, the United States Courts of Appeals, or United States District Courts recognizing any such duty on the part of the named respondents or any other federal officer.[21]

### Relief in the Nature of Mandamus is Not Available to Compel Federal Officers to Enforce Indian Tribal Court Orders

As this court has previously explained,[22] mandamus is a "writ issued by a superior court to compel a lower court or a government officer to perform mandatory or purely ministerial duties correctly."  *Black's Law Dictionary* 973 (7th ed. Bryan A. Garner, ed. 1999).  According to the court of appeals, "Mandamus is the traditional writ designed to compel government officers to perform nondiscretionary duties.  *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 168-69, 2 L.Ed. 60 (1803)."  *Simmat v. United States*

---

[21]Nothing in *Montoya* suggests that "Victoria's Band" had the power to issue orders that were binding on federal officers and the state and federal courts, or that in 1879-1880, they made any effort to issue such orders. It appears that they had other things on their minds at that time.

[22](*See* Order of Dismissal, filed February 23, 2006 (dkt. no. 6), at 2-3.)

*Bureau of Prisons*, 413 F.3d 1225, 1234 (10th Cir. 2005).

> For mandamus to issue, there must be a clear right to the relief sought, a plainly defined and peremptory duty on the part of respondent to do the action in question, and no other adequate remedy available. *Hadley Memorial Hosp., Inc. v. Schweiker*, 689 F.2d 905, 912 (10th Cir. 1982). Petitioner must also show that his right to the writ is "clear and indisputable." *Mallard v. United States Dist. Court for the S. Dist. of Iowa*, 490 U.S. 296, 109 S.Ct. 1814, 1822, 104 L.Ed.2d 318 (1989); *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35-36, 101 S.Ct. 188, 190-191, 66 L.Ed.2d 193 (1980); *In re Vargas*, 723 F.2d 1461, 1467 (10th Cir. 1983); *United States v. Carrigan*, 778 F.2d 1454, 1466 (10th Cir. 1985).

*Johnson v. Rogers*, 917 F.2d 1283, 1285 (10th Cir. 1990); *see Weston v. Mann (In re Weston)*, 18 F.3d 860, 864 (10th Cir. 1994) (a writ of mandamus is an extraordinary remedy that may only be granted if a petitioner shows that his right to the writ is "clear and indisputable.").

Richmond points to the Supremacy Clause of Article VI of the United States Constitution as the legal footing for the duty he asserts, including within its scope "Statutes, Appellate Court Cases, U.S. Supreme Court Cases, Treaties and Common Law"; he argues that "[t]he U.S. Supreme Court has ruled loud and clear for 105 years regarding Indian Rights and Indian Sovereignty. No Court Nor Law Enforcement Officer has the Legal Right to Ignore or Nullify U.S. Supreme Court Rulings and Article VI Supremacy Clause of the U.S. Constitution." (Proposed "Amended Writ of Mandamus to Conform With Subject Matter Jurisdiction. Issues Covered in Court Order to Dismiss Case Without Prejudice" at 5, 6.)

Of course, "Indian law is uniquely federal in nature, having been drawn from the Constitution, treaties, legislation, and an 'intricate web of judicially made Indian law.' *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 206, 98 S.Ct. 1011, 1020, 55 L.Ed.2d

-23-

209 (1978)."[23]  Besides the power vested in the Congress by the Indian Commerce Clause of Article I, § 8, cl. 3, the President's "Power, by and with the Advice and Consent of the Senate, to make Treaties" under Article II, § 2 comes into play:

> A treaty between the United States and an Indian tribe "is essentially a contract between two sovereign nations." *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (*Fishing Vessel*).  Nonetheless, treaties constitute the "supreme law of the land," *Breard v. Greene*, 523 U.S. 371, 376, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (per curiam), and they have occasionally been found to provide rights of action for equitable relief against non-contracting parties, *see United States v. Winans*, 198 U.S. 371, 377, 25 S.Ct. 662, 49 L.Ed. 1089 (1905).

*Skokomish Indian Tribe v. United States*, 410 F.3d 506, 512 (9th Cir. 2005), *cert. denied*, 126 S.Ct. 1025 (2006).

Richmond argues that "[t]his Court is required to Obey Article VI Supremacy Clause that is the **Supreme Law of the Land** that includes **Treaties**,"[24] but Richmond cites to *no* treaty between the United States and the purported Wampanoag or Pembina bands, including the 1863 Treaty with the Chippewas, that imposes "a plainly defined and peremptory duty on the part of respondent[s] to do the action in question," *viz.*, enforce tribal court orders as against the state and federal courts in California and Utah.[25]  Nor

---

[23]*Wilson v. Marchington*, 127 F.3d 805, 813 (9th Cir. 1997), *cert. denied*, 523 U.S. 1074 (1998).

[24](Pet. Supp. at 2 (emphasis in original).)

[25]Richmond's Supplement also cites to the 1975 "Helsinki Accords" (officially entitled *Conference on Security and Cooperation in Europe: Final Act*), 73 Dept. of State Bull. 323 (1975), but the Helsinki Accords are

> phrased in generalities, and there is no indication that the nations signing the agreement anticipated that it would be enforced by private litigants.  Indeed, the Accords reaffirm respect for the sovereignty of its signers, *id.* at 324, and pledge noninterference in the internal affairs of those nations, *id.* at 325. Rather, the Accords create obligations on the signatory countries and establish goals which the nations will try to reach on their own.

*Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 375 (7th Cir. 1985) (per curiam).  As then-President Ford stated before signing the Accords in 1975:

(continued...)

-24-

does he cite to any Act of Congress creating any such obligation on the part of the named respondents, or any federal officer.[26]

None of the judicial opinions cited by Richmond or by the documents he submits support his sweeping assertion that the named respondents must enforce the purported tribal court orders upon which he relies, or that this court "has No Authority or Discretion but to Confirm and Obey Judge Henry Lee Norman Anderson's Writ of Mandamus."[27]

Richmond misapprehends the legal principles governing the recognition and enforcement of judgments and orders in different state and federal courts.  As one scholarly commentary explains:

> Any judgment not rendered within the territorial jurisdiction of a state of the United States is, strictly speaking, a "foreign judgment" to that state.  To be enforced in a state other than where rendered, such a judgment must be "recognized" and "given effect" by the local authority of the forum.  Usually this recognition is by the judiciary of the second state, but the judgment may also be enforced administratively.  The Full Faith and Credit Clause of the federal Constitution mandates such recognition and effect for

---

[25](...continued)
> I would emphasize that the document I will sign is neither a treaty *nor is it legally binding on any particular state*. The Helsinki documents involve political and moral commitments aimed at lessening tension and opening further the lines of communication between the peoples of East and West.

*United States v. Kakwirakeron*, 730 F. Supp. 1200, 1201 (N.D.N.Y. 1990) (quoting 73 Dept. of State Bull. 204, 205 (1975) (emphasis supplied by court)).  "Thus, '[i]ndividuals aggrieved by the failure of nations to implement the Helsinki Accords will have to be content with the principle that violations of international agreements "are normally to be redressed outside the courtroom."'  *Frolova*, 761 F.2d at 376 (quoting *Canadian Transport Co. v. United States*, 663 F.2d 1081, 1092 (D.C. Cir. 1980))."  *Id.* at 1202.

Richmond also points to the 1961 Hague Convention abolishing the Requirement of Legalization for Foreign Public Documents, the text of which may be found in T.I.A.S. 10072; 33 U.S. Treaty Series (UST) 883; 527 U.N. Treaty Series (UNTS) 189, in the "International Law Digests" volume of the *Martindale-Hubbel Law Directory*, and on the Internet, *see* http://www.hcch.net/index_en.php?act=conventions.text&cid=41.  The Convention provides for the simplified certification of public (including notarized) documents to be used in countries that have joined the convention, and has no bearing upon the enforcement of Indian tribal court orders within the United States.  *See* U.S. Dept. of State, Office of Authentications, "Apostille Requirements," *at* http://www.state.gov/m/a/auth/c16921.htm.

[26]Richmond cites to 28 U.S.C. § 2072, which simply confirms that "[t]he Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts . . . and courts of appeals," and says nothing about Indian tribes, tribal courts, or tribal court orders.

[27](Addendum at 2.)

> interstate judgments. In one of the few legislative implementations of the Clause thus far, Congress has specified that the "records and judicial proceedings of any court of any . . . State, Territory or Possession" of the United States "shall have the same full faith and credit in every court . . . as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."
>
> Mandatory recognition of a judgment under the Clause presupposes a *valid* judgment of a sister state, for instance, one based on proper jurisdiction and not defective for other reasons, such as fraud. The recognition requirement applies to state court judgments in the courts of sister states and in federal courts as well as to the recognition of federal judgments in state courts. The effect to be given the judgment is generally determined by the local law of the rendering court.

Eugene F. Scoles & Peter Hay, *Conflict of Laws* § 24.12, at 933-35 (1984) (emphasis in original; footnotes omitted). "The Full Faith and Credit Clause, taken alone, does not provide immediate enforcement of sister-state judgments, in the sense of obviating the need for an action on the judgment," *id.* § 24.13, at 935; Congress has provided a statutory procedure for the registration of many federal court judgments in other federal districts, *see* 28 U.S.C. § 1963, and many states have adopted a registration procedure for judgments rendered in other jurisdictions.

Thus a party seeking to enforce a federal or state court judgment in a federal or state court in another state or federal district generally must commence a recognition proceeding or a civil action upon that judgment in a court of the jurisdiction where he seeks its enforcement. Upon formal recognition of the judgment by the latter court, it may then be enforced as a judgment of that court by the officers having the duty to do so.

Federally recognized Indian tribes are *not* an arm of the United States government and their courts are not federal courts. *See, e.g.*, *United States v. Wheeler*, 435 U.S. 313 (1978). Nor are tribes "States" for purposes of the Full Faith and Credit Clause, or the corresponding federal statute, 28 U.S.C. § 1738. If the judgments of Indian tribal courts are not entitled to full faith and credit in the federal and state courts, then they are subject

-26-

to recognition and enforcement as a matter of comity between sovereigns, similar to that afforded judgments of the courts of foreign nations.[28]  *See, e.g.*, *MacArthur v. San Juan County*, 391 F. Supp. 2d 895, 1015-23 (D. Utah 2005).

In *Wilson v. Marchington*, 127 F.3d 805 (9th Cir. 1997), *cert. denied*, 523 U.S. 1074 (1998), another case relied upon by Richmond, the Ninth Circuit explained:

> No legal judgment has any effect, of its own force, beyond the limits of the sovereignty from which its authority is derived.  Because states and Indian tribes coexist as sovereign governments, they have no direct power to enforce their judgments in each other's jurisdictions.  By contrast, the United States Constitution and implementing legislation require full faith and credit be given to judgments of sister states, territories, and possessions of the United States.  U.S. Const. art. IV, § 1, cl. 1; 28 U.S.C. § 1738. The extent to which the United States, or any state, honors the judicial decrees of foreign nations is a matter of choice, governed by "the comity of nations." *Hilton v. Guyot*, 159 U.S. 113, 163, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895).
>
> * * * *
>
> Certainly, there are policy reasons which could support an extension of full faith and credit to Indian tribes. Those decisions, however, are within the province of Congress or the states, not this Court.  Full faith and credit is not extended to tribal judgments by the Constitution or Congressional act, and we decline to extend it judicially.

127 F.3d at 807-08, 809 (footnote omitted).  Far from holding that "[n]on-Indians must obey Tribal Court and even State Courts must obey Tribal Court" in all cases,[29] *Wilson*

---

[28]*See, e.g., Society of Lloyd's v. Reinhart*, 402 F.3d 982 (10th Cir. 2005); *cf. Hilton v. Guyot*, 159 U.S. 113, 202-03 (1895).  In contrast to applying state law rules concerning the recognition of foreign judgments, "the quintessentially federal character of Native American law, coupled with the imperative of consistency in federal recognition of tribal court judgments, by necessity require that the ultimate decision governing the recognition and enforcement of a tribal judgment by the United States be founded on federal law." *Wilson v. Marchington*, 127 F.3d at 812.

[29]("Court Ordered Writ of Mandamus," a copy of which is annexed to Addendum (citing *Wilson v. Marchington*).)  The citation to "Wilson v. Marchington, 523 U.S. 174 (1998)" as support for this assertion in Richmond's written materials is plainly wrong.  The case reported in volume 523 of the *United States Reports*, inclusive of page 174 is *Lewis v. United States*, 523 U.S. 155 (1998), a case involving the statutes applicable to the deliberate murder of a four-year-old child by her parents on the Fort Polk Army Base in Louisiana. Justice Scalia's concurring opinion in *Lewis*, which begins at page 173, says not a word about Indian tribal sovereignty or tribal court orders.  At page *1074*, one finds a one-line order entered April 20, 1998: "Petition for writ of certiorari to the United States Court of Appeals for the Ninth Circuit denied," referring to *Wilson v. Marchington*, 127 F.3d 805 (9th Cir.), and likewise saying nothing of substance about Indian tribal sovereignty or tribal court orders.

declined enforcement of a tribal court judgment because of the tribal court's lack of subject-matter jurisdiction over the non-Indian parties to the litigation.  *Id.* at 813-15.

Clearly, tribal court orders and judgments—enforceable as they may be *within* the issuing court's territorial jurisdiction—are not entitled to direct enforcement *outside* of that jurisdiction; instead, "tribal court judgments should be enforced off-reservation through the state or federal court systems," *Handbook* (2005 ed.) § 7.07[3]9c], at 667, likely using the established procedures for recognition and enforcement of judgments of the courts of another sovereign.

 In his original and proposed amended petitions, Richmond does not invoke any procedure for the recognition and enforcement of foreign judgments or orders in the federal courts.  To the contrary, he insists that the "Pembina" court "writ of mandamus" served to validate the "Wampanoag" court orders, and thereafter the named respondents and state and federal courts are duty-bound by their oaths of office to see to the enforcement of those orders.

Framed in those terms, Richmond's proposed amended petition must fail because of its legal insufficiency.

**This Court May Not Vacate Orders or Judgments Entered by the United States District Court for the Southern District of California or the State Courts of California and Utah on the Grounds Asserted by Richmond**

Richmond's proposed amended petition demands that this court compel the named respondents to obtain the dismissal of judicial proceedings alleged to be pending before the United States District Court for the Southern District of California, the California Superior Court, and Third District Court of the State of Utah, based upon the purported "Wamapanaog" tribal court orders upon which he relies, and that this court grant relief vacating any orders entered by those courts after the "Wampanoag" orders were issued.

-28-

The underlying premise of Richmond's claim is that those courts lack jurisdiction to adjudicate Richmond's interests because of his status as a "Sovereign Citizen" and as an "adopted" member of the purported "Wampanoag Tribe of Grayhead Wolf Band."

In asserting that "[a]s an International Sovereign Citizen, Plaintiff Curtis Richmond has Diplomatic Immunity,"[30] Richmond confuses the jurisdictional implications of Indian tribal membership with the legal immunity afforded diplomatic and consular officials of foreign nations.[31]  Contrary to Richmond's assertion, Indian tribes and their members are not covered by the provisions of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602 *et seq.* (2000).  *Cf.  Bank of Oklahoma v. Muscogee (Creek) Nation*, 972 F.2d 1166, 1169 (10th Cir. 1992) (noting that "the Supreme Court has explicitly stated that Indian tribes are not foreign sovereigns, but are 'domestic dependent nations.'  *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 25, 31, 8 L.Ed. 25 (1831)").[32]

Even assuming that Richmond is a *bona fide* "adopted" member of a *bona fide* Indian tribe,[33] the tribe's civil authority does not follow him wherever he goes, cloaking him in a mantle of civil immunity, excusing him from the commonplace civil obligations

---

[30](Addendum at 3.)

[31]*See* U.S. Dept. of State, Bureau of Diplomatic Security, *Diplomatic and Consular Immunities*, *at* http://www.state.gov/m/ds/immunities/c9118.htm; Vienna Convention on Diplomatic Relations, dated April 18, 1961, *available at*  http://untreaty.un.org/ilc/texts/instruments/english/conventions/9_1_1961.pdf; *see generally Tachiona v. United States*, 386 F.3d 205 (2d Cir. 2004), *petition for certiorari filed*, 74 U.S.L.W. 3425 (Jan 12, 2006) (No. 05-879).

[32]Nothing in the language of the Act of July 27, 1868, "concerning the Rights of American Citizens in foreign States," ch. 249, 15 Stat. 223, lends any support to Richmond's assertions in this proceeding.

[33]"Adoption" into tribal membership, even by the governing body of a federally recognized Indian tribe, does not necessarily confer legal status as an "Indian" on the adoptee for all purposes, particularly where none of the individual's ancestors lived in what is now the United States before its discovery by Europeans.  *See Handbook* (2005 ed.), § 3.03, at 171-82; *see also* Indian Reorganization Act of 1934, 25 U.S.C.A. § 479 (2001) ("The term 'Indian' as used in [this Act] shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction," among others.)

to pay non-discriminatory taxes, register his vehicles, perform his contracts, repay his debts or obey federal, state and local laws.  As the Supreme Court recently observed, "we have concluded that '[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State.'"  *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. ___, 126 S. Ct. 676, 679 (2005) (quoting *Mescalero Apache Tribe v. Jones*, 411 U.S.145, 148-49 (1973)).  An Indian tribe itself may remain immune from suit for activities conducted outside of its own territory, *see, e.g.*, *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 753-60 (1998), but tribal immunity does not extend to shield individual members from the legal consequences of their own private off-reservation activities.  *See, e.g.*, *Oklahoma Tax Com'n v. Chickasaw Nation*, 515 U.S. 450 (1995) (holding that State may tax income of tribal members residing outside of reservation); *United States on Behalf of Cheyenne River Sioux Tribe v. State of South Dakota*, 105 F.3d 1552, 1556 (8th Cir. 1997) (observing that "states may impose on tribal members a sales tax or other nondiscriminatory tax on off-reservation purchases"); *Tunica-Biloxi Tribe v. Louisiana*, 964 F.2d 1536 (5th Cir. 1992) (same); *cf. Jicarilla Apache Tribe v. Board of County Comm'rs*, 118 N.M. 550, 555-58, 883 P.2d 136, 141-44 (1994) (holding that State court had jurisdiction to adjudicate pre-existing interests in off-reservation real property purchased by Indian tribe).

Generally, then, "Indian tribes and their members, when outside of Indian country, are subject to nondiscriminatory state law unless federal law provides otherwise.  State courts have jurisdiction over suits against individual Indians arising outside Indian country."  *Handbook* (2005 ed.) § 7.03[1], at 608 (footnotes omitted).

There appears to be no serious question that federal district courts may exercise

-30-

jurisdiction over cases or controversies involving tribal members and arising out of off-reservation activities, to the same extent as would be true of non-Indian litigants under the applicable "federal question" and "diversity" jurisdictional statutes, *see* 28 U.S.C.A. §§ 1331, 1332 (1993 & Supp. 2005), subject to the non-jurisdictional requirement that the parties to any case subject to tribal jurisdiction must exhaust their tribal remedies before turning to the federal courts for relief.  *See* Annotation, *Construction and Application of Federal Tribal Exhaustion Doctrine*, 186 A.L.R. Fed. 71 (2003).[34]

Other than his expansive assertions of personal sovereignty and diplomatic immunity, Richmond has not articulated any legal basis for a conclusion that the United States District Court for the Southern District of California lacked subject-matter or personal jurisdiction over him in the litigation before that court.[35]  From Richmond's submissions, it appears that the court in that case awarded declaratory and injunctive relief against Richmond in December of 2005.[36]

---

[34]Federal jurisdiction may also extend to controversies involving tribal members or their interests in property located in Indian country, in an appropriate case.  *See, e.g., Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9 (1987) (holding that federal district court had diversity jurisdiction over insurance dispute, but that a federal court may not exercise diversity jurisdiction over a civil dispute relating to reservation affairs before an appropriate Indian tribal court system has had an opportunity to determine its own jurisdiction); *Richardson v. Malone*, 762 F.Supp. 1463 (N.D. Okl. 1991) (finding federal question jurisdiction over breach of contract action against Indian defendants seeking foreclosure upon alleged security interest in property located in Indian country in the absence of tribal court remedy); *cf. Superior Oil Co. v. Merritt*, 619 F. Supp. 526 (D. Utah 1985) (holding that federal district court lacks diversity jurisdiction over a reservation-based tort claim concurrent with civil jurisdiction of tribal courts); *White v. Pueblo of San Juan*, 728 F.2d 1307, 1312 (10th Cir. 1984) (holding that a plaintiff must actually first seek a tribal remedy where if it exists is exclusive).

Even where a lawsuit arises from an Indian tribe or tribal entity's off-reservation activities, exhaustion of tribal remedies may be required.  *See Ninigret Development Corp. v. Narragansett Indian Wetuomuck Housing Authority*, 207 F.3d 21, 32 (1st Cir. 2000) (stating that "[t]o trigger exhaustion, an 'off-the-reservation' claim must at a bare minimum impact directly upon tribal affairs"); *Texaco, Inc. v. Zah*, 5 F.3d 1374 (10th Cir. 1993).

[35]*Concord EFS Nat'l Bank v. Richmond*, Case No. 04 CV 00304 LAB (BLM) (S.D. Cal., judgment entered December 21, 2005).

[36]In doing so, the Southern District of California was likely abiding by Chief Justice John Marshall's admonition in *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264 (1821) that a court

must take jurisdiction if it should.  The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by, because it

(continued...)

-31-

Generally, a federal district court is without jurisdiction to afford relief from a mandatory injunction issued from a federal district court sitting in another circuit. *See Carter v. United States*, 733 F.2d 735, 736 (10th Cir. 1984), *cert. denied*, 469 U.S. 1161 (1985). And while "[h]istorically, it has been within the equitable powers of a federal court to grant relief from a civil judgment issued by another federal court[,] *[s]ee Oliver v. City of Shattuck ex rel. Versluis*, 157 F.2d 150, 152 (10th Cir. 1946), . . . [c]ourts have declined to exercise jurisdiction over such claims when they may be brought in the court which entered the judgment." *Carter v. Attorney General of U.S.*, 782 F.2d 138, 142 n.4 (10th Cir. 1986) (citing *Lapin v. Shulton, Inc.*, 333 F.2d 169 (9th Cir.), *cert. denied*, 379 U.S. 904 (1964)).[37]

If there is a genuine question concerning subject-matter jurisdiction over Richmond in the Southern District of California, he may raise that question before that court at any time. *See* Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."). There is nothing requiring Richmond to raise that question in this forum, and no basis in federal law for a purported tribal court to interfere with that

[36](...continued)
is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them.

*Id.* at 404; *see United States v. Will*, 449 U.S. 200, 216 n.19 (quoting *Cohens*). Richmond's complaint appears to be not that the courts in California and Utah have refused to exercise their jurisdiction or to decide an issue, but that they have exercised jurisdiction and decided issues adversely to him. Chief Justice Marshall's colorful metaphor notwithstanding, an adverse judicial ruling does not amount to *treason* in any meaningful legal sense; at most, it presents grounds for an appeal. *See* 28 U.S.C.A. §§ 1291-92 (1993).

[37]"The federal courts may entertain such independent actions in cases of fraud, accident, or mistake, or when equitable relief is otherwise warranted. *See Bankers Mortgage Co. v. United States*, 423 F.2d 73, 78-79 (5th Cir.), *cert. denied*, 399 U.S. 927, 90 S.Ct. 2242, 26 L.Ed.2d 793 (1970); Fed. R. Civ. P. 60(b); 7 J. Moore, Federal Practice ¶ 60.36, at 366-67 & n. 7 (2d ed. 1985); 11 C. Wright & A. Miller, Federal Practice & Procedure § 2868, at 242-43 (1973)." *Id.*

federal district court's jurisdictional determinations.  If Richmond was dissatisfied with the rulings of the federal district court in California, he had the opportunity to appeal.

Nor is this court in a position to grant the relief Richmond seeks concerning state court proceedings in California or Utah to which he is a party.

> A United States District Court has no authority to review final judgments of a state court in judicial proceedings. Such review resides exclusively in the United States Supreme Court. See 28 U.S.C. § 1257 (1982); *see also Phelps v. Kansas Supreme Court*, 662 F.2d 649, 651 (10th Cir.1981), *cert. denied*, 456 U.S. 944, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982); *Younger v. Colorado State Board of Law Examiners*, 625 F.2d 372, 375 (10th Cir. 1980).

*Razatos v. Colorado Supreme Court*, 746 F.2d 1429, 1432 (10th Cir. 1984).  Further, under the Anti-Injunction Act,  "A court of the United States may not grant an injunction to stay proceedings in a State Court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."  28 U.S.C.A. § 2283 (1994).  "The Supreme Court has made clear that the statute imposes an absolute ban on federal injunctions against pending state court proceeding, in the absence of one of the recognized exceptions in the law."  *Phelps v. Hamilton*, 122 F.3d 1309, 1324 -1325 (10th Cir. 1997) (citing *Mitchum v. Foster*, 407 U.S. 225, 228-29 (1972)).

> The Anti-Injunction Act precludes federal courts from enjoining state court actions unless (1) Congress has expressly authorized such relief by statute, (2) an injunction is "necessary in aid of (the court's) jurisdiction," or (3) an injunction is necessary "to protect or effectuate (the court's) judgments." 28 U.S.C. § 2283.  In the interest of comity and federalism, these three exceptions must be strictly construed.  "'(D)oubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy.'"  *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 630, 97 S.Ct. 2881, 2887, 53 L.Ed.2d 1009 (1977) (plurality opinion), quoting *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 297, 90 S.Ct. 1739, 1748, 26 L.Ed.2d 234 (1970). The exceptions to the Act "should not be enlarged by loose statutory construction."  *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*, *supra*, 398 U.S. at 287, 90 S.Ct. at 1743.  In short, a federal injunction restraining prosecution of a lawsuit in state court is absolutely

-33-

> prohibited unless authorized by one of the three narrow statutory exceptions specifically defined in the Anti-Injunction Act.  *Mitchum v. Foster*, 407 U.S. 225, 228-29, 92 S.Ct. 2151, 2154, 32 L.Ed.2d 705 (1972).  It makes no difference whether the injunction applies to the private litigants or is imposed directly on the state court itself.  *See, e.g.*, *Henry v. First Nat'l Bank of Clarksdale*, 595 F.2d 291, 300 (5th Cir. 1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980); 17 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4222, at 317 (1978).

*Alton Box Bd. Co. v. Esprit de Corp.*, 682 F.2d 1267, 1270-71 (9th Cir. 1982).

Richmond does not point to any Act of Congress authorizing this court to grant injunctive relief vacating orders entered in, or compelling the dismissal of, the state court actions pending against him.  Nor would relief in the nature of mandamus requiring compliance with Richmond's purported tribal court orders requiring such dismissal be granted "in aid of" this court's jurisdiction, or "to protect or effectuate" this court's judgments, as the Anti-Injunction Act would require.  Absent specific congressional authorization, the Act's language allows a federal court to issue an injunction only if "necessary in aid of its jurisdiction, or to protect or effectuate its judgments," 28 U.S.C. § 2283.  Thus it would impermissibly enlarge the exceptions "by loose statutory construction," *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 287 (1970), to allow one federal district court to issue an injunction in order to aid the jurisdiction or protect the judgment of another court, be it another federal district court or the court of another sovereign.  *See Alton Box*, 682 F.2d at 1273.

Richmond could have raised any valid legal objections he may have to the subject-matter jurisdiction of the California or Utah courts before those forums at any time (*see* Utah R. Civ. P. 12(h)(2);  5 Witkin, *Cal. Procedure*: *Pleading* § 922, at 380 (4th ed. 1997) ("Lack of *subject matter* jurisdiction is not waived by failure to demur, but can be

attacked by motion or suggestion at any time during trial or on appeal . . . .")[38]),  and could appeal to the appropriate state court of appeals any ruling that he believed to be erroneous.

Neither Richmond's original petition nor his proposed amended petition plead specific facts showing that his remedies at law in the California and Utah courts are inadequate or have been exhausted.  The Fifth and Fourteenth Amendments to the Constitution guarantee Richmond the Process which is Due, namely, "'the opportunity to be heard "at a meaningful time and in a meaningful manner,"'" consistent with the requirements of fundamental fairness.  *Schroeck v. Gonzales*, 429 F.3d 947, 952 (10th Cir. 2005) (quoting *de la Llana-Castellon v. INS*, 16 F.3d 1093, 1096 (10th Cir. 1994) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)) (further quotation omitted)).  But to enjoy the benefits of the Due Process Clause, Richmond must avail himself of the procedural remedies of the courts in California and Utah into which he has already been haled.  By itself, the fact that Richmond has not prevailed in those forums does not render

---

[38]As the California Supreme Court explains:

A challenge to the subject matter jurisdiction of a court is properly brought by demurrer to the complaint (Code Civ.Proc., § 430.10, subd. (a); see, e.g., *Santiago v. Employee Benefits Services* (1985) 168 Cal.App.3d 898, 214 Cal.Rptr. 679; *Miller v. R.K.A. Management Corp*. (1979) 99 Cal.App.3d 460, 160 Cal.Rptr. 164). It may also be raised by a motion to strike (Code Civ.Proc., §§ 435, 437); motion for judgment on the pleadings (*Jarchow v. Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917, 122 Cal.Rptr. 470); motion for summary judgment (Code Civ.Proc., § 437c; *Hisel v. County of Los Angeles* (1987) 193 Cal.App.3d 969, 238 Cal.Rptr. 678; *United States Borax & Chemical Corp. v. Superior Court* (1985) 167 Cal.App.3d 406, 213 Cal.Rptr. 155); or in an answer (*Horney v. Guy F. Atkinson Co.* (1983) 140 Cal.App.3d 923, 190 Cal.Rptr. 18).

*Greener v. Workers' Comp. Appeals Bd.*, 6 Cal. 4th 1028, 1036, 863 P.2d 784, 789, 25 Cal. Rptr. 2d 539, 544 (1993); *see also Great Western Casinos, Inc. v. Morongo Band of Mission Indians*, 74 Cal. App. 4th 1407, 1418-25 88 Cal. Rptr. 2d 828, 836-41 (2d Dist. 1999) (affirming dismissal for lack of subject matter jurisdiction where a state court civil action by Indian tribe's gaming manager against tribe and tribal officers in their official capacity was barred by the tribe's sovereign immunity and pre-empted by federal legislation), *cert. denied*, 531 U.S. 812 (2000).
    Moreover, California Code of Civil Procedure § 663 permits a motion to vacate where the legal basis for the order was erroneous, even where the moving party asserts a legal theory not previously argued to the court.  *Hoffman-Haag v. Transamerica Ins. Co.*, 1 Cal. App. 4th 10, 15-16, 1 Cal. Rptr. 2d 805 (1991).

the proceedings fundamentally unfair or provide a basis for extraordinary equitable relief by which one court interferes with proceedings pending before another court.

### Law, Language & Litigants

"Jurisdiction is a matter of law, statute, and constitution, not a child's game wherein one's power is magnified or diminished by the display of some magic talisman," *McCann v. Greenway*, 952 F. Supp. 647, 651 (W.D. Mo. 1997), or by the use of special seals or "Apostilles" on documents, or by the recital of Special Words, Phrases or Arcane Incantations, whether capitalized in written text or not.[39]

Law necessarily finds expression through language, but the words through which law is expressed do not by themselves change or directly affect the world.[40]  Through common agreement as to meanings, the words symbolize, identify and describe legal ideas and concepts—a standard of conduct, a process, a power, a duty, a right or a privilege.  Legal language *correlates* with these ideas and concepts, but the language itself does not *cause* a legal consequence simply because the words are written into a document or a pleading.  The words of the law are functional, but they *communicate* ideas commonly shared, rather than *cause* a legal consequence merely by their use.[41]

Simply labeling one's self as a "Sovereign Citizen" does not immunize a person

---

[39]*See, e.g.*, *United States v. Mitchell*, 405 F. Supp. 2d 602, 603-06 (D. Md. 2005) ("'It makes no sense to rest a jurisdictional distinction upon the use of all upper case letters or a mixture of upper and lower case letters.  The federal courts abandoned this level of formalism long ago.'" (quoting *United States v. Singleton*, 2004 WL 1102322, *3 (N.D. Ill. May 7, 2004))); *see also Sadlier v. Payne*, 974 F. Supp. 1411 (D. Utah 1997).

[40]*Cf.* "Magical Thinking," *at* http://en.wikipedia.org/wiki/Magical_thinking ("Another form of magical thinking occurs when people believe that words can directly affect the world.  This can mean avoiding talking about certain subjects ('speak of the devil and he'll appear'), using euphemisms instead of certain words, or believing that to know the 'true name' of something gives one power over it, or that certain chants, prayers or mystical phrases will change things."); *see generally* James George Frazer, Robert Fraser, *The Golden Bough: A Study in Magic and Religion* (Oxford abr. ed. 1998).

[41]Magical thinking "often mistakes correlation for causation." *Id.*

from the jurisdiction or processes of the state or federal courts.  Adopting the label of "federal tribal circuit court" or even "supreme court" by itself does not imbue someone with the constitutional authority to bind the Attorney General of the United States or the United States Marshal to the enforcement of orders issued in that name.

Far from being some occult charm or arcane formula, the phrase *tribal sovereignty* identifies in shorthand fashion the central principle defining the legal relationship between Indian tribes, bands and communities and the governments of the United States and the several States: "Perhaps the most basic principles of all Indian law, supported by a host of decisions . . . is the principle that *those powers which are lawfully vested in an Indian tribe are not, in general delegated powers granted by express acts of Congress, but rather inherent powers of a limited sovereignty which has never been extinguished*." Felix S. Cohen, *Handbook of Federal Indian Law* 122 (1942 ed.) (emphasis in original). As the court of appeals has explained:

> Indian tribes are neither states, nor part of the federal government, nor subdivisions of either.  Rather, they are sovereign political entities possessed of sovereign authority not derived from the United States, which they predate. *See McClanahan*, 411 U.S. at 172, 93 S.Ct. 1257 ("[T]he . . . Indian [tribes'] . . . claim to sovereignty long predates that of our own Government.").  The Pueblo, like all Indian tribes, need not rely on a federal delegation of powers.  "Indian tribes consistently have been recognized . . . by the United States, as 'distinct, independent political communities' qualified to exercise powers of self-government, not by virtue of any delegation of powers, but rather by reason of their original tribal sovereignty."  Felix Cohen, *Handbook of Federal Indian Law* 232 (1982) (footnotes omitted) (citing *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832)).  Tribes retain those attributes of inherent sovereignty not withdrawn either expressly or necessarily as a result of their status. *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). "[U]ntil Congress acts, the tribes retain their existing sovereign powers." *Id*. . . . .

*N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186, 1192 (10th Cir. 2002) (footnote omitted).

"[T]he doctrine of American Indian tribal sovereignty is a legal and conceptual

conundrum.  'Domestic dependent nations,' as Justice John Marshall famously labeled

Indian tribes, are unique and paradoxical constructions."[42]  Yet there are "many members

of tribal nations for whom 'sovereignty' is as common and heartfelt a term as 'rights' is to

most other Americans.  Many tribal members perceive that their cultural survival is

inextricably linked to their existence as separate, self-governing nations."[43]  The "core

values that sovereignty, by almost any definition, is intended to protect . . . include

providing peace and security, developing economic opportunities, and allowing for the

expression of social, cultural, and linguistic patterns" that signify "the continued

existence of Indian tribes as separate cultures,"[44] as "distinctly Indian communities."[45]

It would be cynical indeed for a private civil litigant to treat tribal sovereignty as

"nothing more than an inconsistent, paradoxical legal shell that American case law has

constructed,"[46] or to attempt to invoke "tribal sovereignty" as nothing more than a clever

scam or an artful dodge[47]—which clearly it is not.

---

[42]Sarah Krakoff, *A Narrative of Sovereignty: Illuminating the Paradox of the Domestic Dependent Nation*, 83 Or. L. Rev. 1109, 1110 (2004).

[43]*Id.*

[44]*Id.* at 1116.

[45]*Sandoval*, 231 U.S. at 46.

[46]Krakoff, *supra*, at 1113.

[47]*Pro se* litigants, no less than the members of the Bar of this Court, are bound by the requirements of Rule 11 of the Federal Rules of Civil Procedure:

**(b) Representations to Court.**
By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by

(continued...)

**SUMMARY**

Granting leave for Richmond to file his proposed amended petition would prove to be futile—that is, it "would merely set the stage for the dismissal of the amended [petition]," *AM Int'l, Inc. v. Graphic Management Assocs., Inc.*, 44 F.3d at 578, because (1) the named respondents owe no nondiscretionary, plainly defined, peremptory and affirmative legal duty to *enforce* the lawful orders or judgments of an Indian tribal court; (2) relief in the nature of mandamus is a drastic remedy, available only in extraordinary circumstances, *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34-35 (1980), and absent such a plainly defined nondiscretionary duty, it is not available to compel federal officers to enforce Indian tribal court orders as such; and (3) Richmond's proposed amended pleading asserts no legal basis warranting the grant by this court of extraordinary equitable relief vacating orders entered in, or mandating the dismissal of, civil actions filed in the United States District Court for the Southern District of California, the California Superior Court and the Third District Court, State of Utah, to which Richmond is a party.

If Richmond has genuine objections to the jurisdiction of those courts in those cases, he may raise his objections before those courts, and if dissatisfied with the outcome, he may file an appeal to the appropriate court of appeals. He cites to *no* controlling case authority—Supreme Court or otherwise—even hinting that he may resort

---

[47](...continued)
a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; [and]

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; . . .

to one or another "tribal court" to wrest jurisdiction over those cases away from the state and federal courts that have adjudicated them, or that he may enlist the Judicial Power of the United States, vested in this court by Article III of the Constitution, to aid him in that effort.

For these reasons,

**IT IS ORDERED** that the plaintiff's "Motion for Leave of Court to Amend Writ of Mandamus to Conform with Subject Matter Jurisdiction Issues Covered in Court Order to Dismiss Without Prejudice" (dkt. no. 11), is DENIED.


DATED this 21 day of April, 2006.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge

-40-